UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                                    PLAINTIFF

v.                                          CRIMINAL NO. 3:16-CR-149-RGJ

MOHAMMED AL ASAI                                                  DEFENDANT

**SENTENCING MEMORANDUM**

*ELECTRONICALLY FILED*

      The United States of America, by counsel, Assistant United States Attorney Amanda Gregory, files its memorandum in support of sentencing in this action currently scheduled for February 7, 2019. The United States does not plan to put on any witnesses at the hearing.

      The United States takes the position that the appropriate guidelines application for Counts 1, 2, and 3 of the Superseding Indictment is an adjusted offense level of 27. As Defendant has a Criminal History Level of I, this results in a sentencing range of 70 to 87 months. Considering this sentencing range, and the sentencing factors under Title 18, United States Code, Section 3553(a), it is the position of the United States that a sentence of 70 months, at the low end of the sentencing range, and an order of restitution for $789,650.62, is appropriate.

**I. BACKGROUND AND OFFENSE CONDUCT**

      The Defendant was the owner and manager of Al Yasmine Food Mart, located at 6700 Strawberry Lane. Al Yasmine opened around 2012. Prior to that, the Defendant had been an owner of Al Sadiq Food Mart. The Defendant submitted applications for both stores to become approved retailers with the Supplemental Nutrition Assistance Program, also known as "SNAP" or the food stamp program.

      Each time that the Defendant submitted an application for a store to be an approved SNAP

retailer, he signed certifications acknowledging the SNAP restrictions, including the restriction on trading cash or ineligible items for SNAP benefits and accepting SNAP benefits as payment on credit accounts. After each store is accepted as an approved SNAP retailer, USDA sends out training materials regarding the program, including these program restrictions. At trial, the Defendant acknowledged that he understood that the SNAP program prohibited the exchange of cash for SNAP benefits. DN 89 (Tr. of Def.'s Testimony, Vol. 2.) at 26:8-27:24.

Beginning as early as January 2013, the SNAP transaction history for Al Yasmine Food Mart revealed numerous suspicious transactions. Based on these transactions, and the volume and amount of SNAP redemptions at Al Yasmine Food Mart, USDA and FBI opened a joint investigation into the store, which involved undercover transactions and interviews with customers and employees.

From in or around and between January 2013 through August 2016, the Defendant exchanged cash for SNAP benefits, in violation of SNAP rules. He also allowed customers of the store to use SNAP benefits to purchase ineligible items. As part of the scheme, he would sometimes use a customer's SNAP EBT card to make purchases at other stores. The Defendant would use the EBT cards to buy stock or other items for his store, then give the customer cash for his purchases. When exchanging cash for SNAP benefits, the Defendant would generally charge an extra $15 to the card for every $100 provided in cash. In essence, the Defendant was paying approximately 87 cents for each dollar charged.

From January 2013 through August 2016, the total for SNAP transactions at Al Yasmine Food Mart was $2,519,173. Based on information from the SNAP authorized retailer application and USDA's site visit of Al Yasmine Food Mart, USDA classified Al Yasmine Food Mart as a "small grocery" store. During the indictment period, the average SNAP sales for all small grocery stores in Jefferson County was $399,621. During the same period, the monthly average SNAP

transaction amount for small grocery stores in Jefferson County ranged from around $19 to $22. During the indictment period, the average SNAP sales for "medium grocery" stores was $531,737.

## II. GUIDELINES CALCULATION

Even in the post-*Booker* sentencing era, the United States Supreme Court and the Sixth Circuit Court of Appeals have reiterated the continued importance of the United States Sentencing Guidelines in the federal sentencing process. *See Gall v. United States,* 552 U.S. 38 (2007), and *United States v. Anderson*, 526 F.3d 319 (6th Cir. 2008). The *Anderson* court opined that

> [a]t the outset, we note that it is unclear that an error in determining the Guidelines recommendation can ever be considered harmless post- *Gall. Gall* clearly directed the focus of sentencing courts to the Guidelines. For instance, the Court held that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. 128 S.Ct. at 596. "[T]he Guidelines should be the starting point and the initial benchmark," so as to ensure fair sentencing "administration and to secure nationwide consistency." *Id.* Furthermore, the Court held, "[t]he fact that 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Id.* at 596 n. 6. If the district court decides to sentence a defendant outside of the Guidelines range, then the district court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. [The Court] f[ou]nd it uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id.* at 597. On appeal, the Courts of Appeals "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range .... or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range." *Id.*

*Id.* at 329. The *Anderson* court further noted that such a focus on the guidelines "is consistent with the Court's other recent sentencing precedent" and went on to reference the decisions in *United States v. Booker*, 543 U.S. 220, 245-46, (2005), *Kimbrough v. United States*, 128 S.Ct. 558, 564

(2007), and *Rita v. United States*, 127 S.Ct. 2456, 2468 (2007), to include the opinions' respective references to the role of the guidelines. *Id*. In *United States v. Bistline*, 665 F.3d 758, 761 (6th Cir. 2012), the Sixth Circuit noted that, although advisory, the Sentencing Guidelines should still be "'the starting point and the initial benchmark' for choosing a defendant's sentence." *Citing Gall v. United States,* 552 U.S. at 49 (2007).

### A. Base Offense Level

The base offense level should be seven. All three counts refer to Section 2B1.1 of the guidelines. Section 2B1.1(a)(1) provides for a base offense level of seven, as the statutory maximum term of imprisonment for Counts 2 and 3, which charge wire fraud, is 20 years or more.

### B. Specific Offense Characteristic – Loss Calculation

It is the United States' position that the fraud loss in this matter is approximately $789,650.62, which results in a 14-point increase pursuant to U.S.S.G. § 2B1.1(b)(1)(H).

Under U.S.S.G. § 2B1.1(b)(1), the Court increases the offense level based on the amount of loss caused by the defendant's conduct, including the acts and omissions of others under U.S.S.G. § 1B1.3(a). Relevant to this matter, loss amount under the Guidelines is the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n. 3(A)(i). Here, the Defendant's bank account received monetary credits from the USDA in amounts equal to the benefits purchased for cash or the benefits used to purchase ineligible items. For cash transactions, even though the Defendant then paid out around 87% of the value of the benefits to recipients in cash, the full value of the benefits is the amount that is used to calculate fraud loss. *See id.* at cmt. n. 3(F)(ii) ("In a case involving government benefits . . ., loss shall be considered to be not less than the value of the benefits obtained by the unintended recipients."); *United States v. Arnous*, 122 F.3d 321, 323 (6th Cir. 1997) ("When food stamp [benefits] are exchanged for cash," the loss "is the face value of the [benefits] exchanged."); *United States v. Hassan*, 211 F.3d

4

380, 383 (7th Cir. 2000).

The Court may determine facts relevant to guideline determinations by a preponderance of the evidence. *United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006). In a case like this, it is impossible to determine the exact amount of the fraud loss. However, the court need not determine the loss amount in a financial crime with precision, but rather "need only make a reasonable estimate of the loss, given the available information." *United States v. Mickens*, 453 F.3d 668, 672 (6th Cir. 2006); *United States v. Brawner*, 173 F.3d 966, 971 (6th Cir. 1999) (approving loss calculations based on estimates of average fraud loss); USSG § 2B1.1, note 3(C).

In *United States v. Hassan*, the court approved a calculation based on "aggregated food stamp redemptions less actual food sales." 211 F.3d at 383. Where reliable figures (e.g., for "actual food sales") are not available, however, a "district court may make a reasonable estimate by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown." *United States v. Uddin*, 551 F.3d 176, 180 (2nd Cir. 2009). Courts have adopted loss calculations that compare the amount of SNAP redemptions at the target store with the monthly level of redemptions at comparable food stores in the area. *See United States v. Sufi*, 456 Fed. Appx. 524, 528 (6th Cir. 2012) (upholding comparison average method because it provided an objective means of loss calculation*); United States v. Jarjis*, 551 Fed. Appx. 261, 263 (6th Cir. 2014) (affirming district court determination of loss through comparison method to similar stores in the local area and to stores statewide).

Using the comparison store method, Al Yasmine's total SNAP sales can be compared to total SNAP sales for all small grocery stores in Jefferson County and all medium grocery stores in Jefferson County. Based on a comparison with the average SNAP sales of "small grocery stores" in Jefferson County, the loss estimate is $2,119,552 (Al Yasmine's $2,519,173 total in SNAP sales less the $399,621 Jefferson County small grocery store average SNAP sales). Based on a

5

comparison with the average SNAP sales of "medium grocery stores" in Jefferson County, the loss estimate is $1,987,436 (Al Yasmine's $2,519,173 total in SNAP sales less the $531,737 Jefferson County medium grocery store average SNAP sales).

In *United States v. Uddin*, the Second Circuit upheld a district court's SNAP fraud loss calculation that was based on assuming a certain percentage of SNAP transactions over $50 were fraudulent. 551 F.3d 176, 180 (2nd Cir. 2009). The district court looked at the average SNAP transaction for similarly-sized grocery stores, which was $12, and then chose $50 as a SNAP transaction amount indicative of fraud. *Id*. The district court rejected the notion that 100% of the transactions over $50 were fraudulent and instead determined that the loss amount was a certain percentage of the transactions that were over $50. *Id*.

The average SNAP transaction amount for small grocery stores in Jefferson County hovered around $20 during the indictment period. Five times that amount would be $100. During the indictment period, there was $1,519,772 in transactions over $100 at Al Yasmine, which means there was only $999,400 in transactions less than $100.

A focus on large transaction amounts is based on the assumption that transactions in which individuals get cash in exchange for benefits will be larger than normal transactions, as individuals will request a large amount of cash, and the Defendant's fee will be added on to any amount. However, focusing solely on large transaction amounts would leave out smaller fraudulent transactions where the Defendant accepted SNAP benefits as payment for non-food items or where the Defendant slowly depleted the value of an EBT card left in his possession.

Any loss amount that is focused only on the SNAP transaction numbers from Al Yasmine will be incomplete, because part of the Defendant's scheme involved providing customers with cash and then using the customers' EBT cards at other stores. Other people's EBT cards were used in conjunction with the Defendant's Sam's Club card to make approximately $29,789.62 in purchases

at Sam's Club. This loss would not be accounted for in any analysis that was focused solely on SNAP transactions at Al Yasmine.

Based on the stock at the Defendant's grocery store and the average SNAP transaction amount at similarly-sized grocery stores, and a sampling of the purchases made with other people's EBT cards and the Defendant's Sam's Club card, the United States has made a conservative estimate that the loss is $789,650.62. This number assumes that approximately 50% of the SNAP transactions over $100, or $759,861 in transactions, were fraudulent, then adds the $29,789.62 in EBT card purchases on the Defendant's Sam's Club card.

### C. Aggravating Role

It is the United States' position that an "aggravating role" enhancement should apply, resulting in a two-point increase pursuant to U.S.S.G. § 3B1.1(c). Excluding the store customers who participated in the scheme, there were not five or more participants in the scheme. As such, U.S.S.G. § 3B1.1(a) and (b) would not apply. However, U.S.S.G. § 3B1.1(c) should apply, as the Defendant was an "organizer, leader, manager or supervisor in any criminal activity other than described in (a) or (b)." Hatem Al-Hussainy told law enforcement that on one occasion he provided cash back in exchange for SNAP benefits on directions from the Defendant, as relayed through another employee. Kareem Taqi testified that in addition to the Defendant and Hatem Al-Hussainy, other individuals who worked for the Defendant as cashiers also provided cash back in exchange for SNAP benefits. The Defendant was the manager and supervisor of the cashiers who worked at Al Yasmine. These cashiers purchased SNAP benefits for cash at the Defendant's direction, using his point of sale machine, resulting in federal funds going to the Defendant's bank account.

### D. Obstruction of Justice

It is the United States' position that the "obstruction of justice" enhancement should apply, which results in a two-point increase pursuant to U.S.S.G. § 3C1.1. The Defendant obstructed and

impeded the administration of justice through his testimony at trial, and his guidelines should be increased two points. The obstruction enhancement instructs the district court to increase a defendant's offense level by two points if the defendant willfully attempted to obstruct the administration of justice during prosecution, and the conduct related to the defendant's offense of conviction. U.S.S.G. §3C1.1. Perjury is a common and proper basis for the enhancement. *See id.* n. 4(B).

"Perjury occurs when a witness, testifying under oath or affirmation, gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *See United States v. Lawrence*, 308 F.3d 623, 631 32 (6th Cir. 2002) (*quoting United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). The offense of perjury has three elements: 1) a false statement under oath, 2) concerning a material matter, 3) with the willful intent to provide false testimony. *See Dunnigan*, 507 U.S. at 94. A sentencing court must make specific findings on the record to aid the appellate court in reviewing that decision. *Lawrence*, 308 F.3d at 632. "The [district] court must: 1) identify those particular portions of defendant's testimony that it considers to be perjurious; and 2) either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury." *Id*.

Here, the Defendant committed perjury by lying multiple times under oath during his testimony at trial. The below table identifies the specific false statements from the Defendant's testimony, along with evidence contradicting the testimony.

| **Defendant's Testimony** | **Evidence Contrary to Defendant's Testimony** |
|---|---|
| A. At that time, I don't recall exactly, like, what the amount because it was several times when he left it with me to give it to her.<br><br>(DN 88, 37:9-11) | • Kareem Taqi testified that he did not give the Defendant money to give to Julie. |

| **Defendant's Testimony** | **Evidence Contrary to Defendant's Testimony** |
|---|---|
| Q. Did you ever have someone -- or let me back up.<br>Did you ever take someone else's EBT card and purchase items at Sam's --<br>A. No.<br>Q. Or Aldi's?<br>A. No.<br>Q. Or anywhere?<br>A. No. Unless the person with me.<br><br>(DN 89, 17:2-9) | • Amela Muratovic testified the Defendant used her card and Shefkije Berisa's card at Sam's Club and the Defendant's Sam's Club records support this.<br>• The Defendant is on video using undercover Julie's card at Sam's Club.<br>• Hatem Al-Hussainy told law enforcement that the Defendant used Al-Hussainy's card at Sam's Club to make purchases for the store in exchange for giving Al-Hussainy cash and the Defendant's Sam's Club records support this. |
| Q. But today we're talking about you. So you would sometimes give him money before he was traveling overseas?<br>A. Yes.<br>Q. And when he borrowed money from you, you charged his EBT card at Sam's Club to pay off that debt, correct?<br>A. No.<br>Q. When he traveled to Iraq, he would leave his EBT card with you?<br>A. No.<br><br>(DN 89, 36:5-13) | • Hatem Al-Hussainy told law enforcement that the Defendant used Al-Hussainy's card at Sam's Club to make purchases for the store in exchange for giving Al-Hussainy cash and the Defendant's Sam's Club records support this.<br>• Hatem Al-Hussainy told law enforcement he left his EBT card and EBT PIN with the Defendant while he was outside the United States. He stated he owed the Defendant money and the Defendant used the SNAP funds from the EBT card to collect on the debt. This is supported by Al-Hussainy's travel records and the transaction history for his EBT card. |
| Q. You gave Amela Muratovic cash in exchange for her EBT benefits, correct?<br>A. No.<br>Q. Do you know who I'm talking about, the woman who testified here, Amela Muratovic?<br>A. The first one, the lady -- the first one, she come testify?<br>Q. Yes.<br>A. No.<br>Q. You -- so you didn't? You're saying "I did not do that"?<br>A. No. I see her, like, three times in the store shopping. | • Amela Muratovic testified she received cash from the Defendant in exchange for her EBT benefits and that the Defendant used her EBT card at Sam's Club. |

| **Defendant's Testimony** | **Evidence Contrary to Defendant's Testimony** |
|---|---|
| Q. Uh-huh. And you say you never gave her cash in exchange for her EBT benefits?<br>A. No.<br>Q. You never used her card at Sam's Club?<br>A. No.<br><br>(DN 89, 57:18-58:8) | |
| Q. Julie, that's our undercover, our helper. You gave her cash in exchange for EBT benefits?<br>A. No. I -- I take the money -- Kareem give me the money, and I just hand the money to her.<br><br>DN 89 59:4-8 | - Kareem Taqi testified the Defendant was the source of the money that went to Julie. |
| Q. Okay. So you said, "I lost your number. I lost the number for the card." Correct?<br>A. Yeah. But I think I was talking on the phone, not talking to her because she's sitting in the dining room and I was over there at the cashier.<br><br>(DN 89, 66:15-19)<br><br>Q. So you said, "I didn't use it." And you're talking to her at that point, right?<br>A. No, I don't think so.<br>Q. You don't think you're talking to her or you don't think you said that?<br>A. No. No, I don't think I'm talking to her.<br>Q. But she's clearly getting up and talking to you.<br>A. No. She got up. She's still walking but not talking.<br><br>(DN 89, 67:18-25) | - This is implausible based on an objective viewing of Exhibit 16I. |

For these reasons, the two-point obstruction enhancement should apply.

### E.     Abuse of Trust

It is the United States' position that the "abuse of trust" enhancement should apply, which results in a two-point increase pursuant to U.S.S.G. § 3B1.3.  The Sentencing Guidelines provide

10

that a defendant's calculated offense level should be increased by two levels if "the defendant abused a position of public or private trust … in a manner that significantly facilitated the commission or concealment of the offense." USSG §

3B1.3. The commentary to the provision provides that:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Personal holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

*Id.* App. Note 1.

"The level of discretion accorded an employee is to be the decisive factor when deciding if an employee holds a position of trust" within the meaning of § 3B1.3. *United States v. Hudson*, 491 F.3d 590, 595 (6th Cir. 2007). The position of trust arises when an organization makes itself vulnerable to someone in a particular position, ceding to that person's judgment some control over their affairs. *United States v. Gilliam*, 315F.3d 614, 618 (6th Cir. 2003).

Courts have routinely applied the abuse-of-trust enhancement to the owners of stores fraudulently redeeming food stamps. *See*, *e.g.*, *United States v. Kasi*, 348 F. App'x 689 (2nd Cir. 2009) (unpublished). The Second Circuit held in that case:

> We agree with the District Court that the case for the abuse-of-trust enhancement was "open and shut." Kasi, but not his co-defendants, was the person who received authorization from the USDA to participate in the food stamp program and was trained to ensure compliance with the program's requirements. Furthermore, Kasi was entrusted by the USDA with the primary responsibility to help prevent fraud and abuse.

*Id.* at 693, *citing United States v. Allen*, 201 F.3d 163, 166 (2nd Cir. 2000) (whether someone occupies a position of trust "turns on the extent to which the position provides the freedom to commit a difficult-to-detect wrong"). *See also United States v. Sarsour*, 271 F. App'x 923, 927-28 (11th Cir. 2008) (enhancement properly applied because store owner "Sarsour had to receive approval from the USDA to participate in the food stamp program, and that approval allowed him

to engage in food stamp fraud."); *United States v. Blankenship*, 134 F. App'x 363 (11th Cir. 2005) ("the district court correctly found that Blankenship held a position of trust in that he was entrusted by the federal government to administer the food stamp program, and to follow the rules of the food stamp program. Blankenship was in a position of significant managerial discretion, in that he was the only employee of [the store] and was authorized to obtain the EBT food stamp machine."); *compare United States v. Sufi*, 455 Fed. Appx. 672, 677-78 (6th Cir. 2012) (upholding upward departure of 27 months based in part on the idea that the case involved an "abuse of trust," where the 3B1.3 enhancement was not explicitly considered by the lower court or the appellate court).

Like the store owners in *Kasi*, *Sarsour*, and *Blankenship*, the Defendant was the sole owner and manager of Al Yasmine Food Mart. After going through the application process, which required that he promise to abide by the program rules, he was entrusted by USDA with the responsibility of administering the program and preventing fraud. Unlike a "mere bank teller," the Defendant's discretion at Al Yasmine was unfettered. He managed other employees. Because the Defendant abused a position that accorded him the freedom to commit a difficult-to-detect wrong, his offense level should be increased by two levels.

### F. Offense Level

Recognizing that the Sentencing Guidelines are the starting point for determining an appropriate sentence, and using the above-cited provisions, the appropriate guidelines offense level is 27.

### III. CRIMINAL HISTORY

The United States concurs with the accuracy of the Criminal History Category calculation of the United States Probation Office. Defendant has no criminal history points and is a Criminal History Category I.

# IV. 18 U.S.C. § 3553(a) FACTORS

This Court must ultimately affix a sentence which is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). Title 18, United States Code, Section 3553(a) guides the Court regarding factors to consider when imposing a sentence. That section directs courts to consider the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed;

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;

    . . .

(5) any pertinent policy statement--

    . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

The Defendant stands convicted of food stamp or SNAP fraud. The sentence imposed in this action should adequately reflect the seriousness of the offense along with the characteristics of the Defendant and provide a just punishment no greater than necessary. Based on these factors, as outlined below, the United States recommends a sentence of 70 months, at the low end of the appropriate sentencing guideline range.

The nature and circumstances of the offense are serious. SNAP is a program designed to

help the poorest members of society pay for a basic necessity – food.  SNAP fraud in the form trading cash for benefits has far-reaching effects.  First, it undermines public confidence in SNAP, which endangers the program as a whole.  Second, it deprives SNAP recipients (albeit with their consent) of money that was intended to be used for food.  Finally, it unjustly enriches the SNAP retailers, who have sworn to abide by the restrictions of the program, and been entrusted with government funds on that basis.

This is not a one-off offense.  The Defendant committed this offense over a long period of time, misappropriating hundreds of thousands of dollars in USDA funds.

As SNAP retailers are provided with trust and discretion, SNAP fraud is difficult to detect. USDA does not have extensive resources for monitoring retailers.  Instead, USDA must largely rely on retailers to uphold and enforce the rules of the program.  As such, it is important for any sentence to deter fraud among other SNAP retailers.

Despite the seriousness of the offense, the Defendant and his conduct also have characteristics that justify a low-end guideline sentence.  The Defendant lacks any criminal history.  He has a history working as a contractor for the United States military.  Finally, it is worth noting that while he was profiting from trafficking in benefits, he paid more than what was regarded as the "market" rate for benefits.  Generally, the market rate was 50 cents on the dollar, while the Defendant paid approximately 87 cents on the dollar.

A sentence of 70 months would satisfy the sentencing factors.  That sentence would account for the seriousness of the offenses and provide needed deterrence to others and protection of the public.  A sentence below the Guidelines would discount the protracted, damaging nature of the Defendant's conduct.

## V. CONCLUSION

For the reasons set forth herein, the United States respectfully requests that the Court apply

the Sentencing Guidelines, as outlined above, follow the statutory directives set out in 18 U.S.C. § 3553(a), and impose a sentence of 70 months, which is the low end of the sentencing range. The United States also requests that the Court issue an order of restitution.

Respectfully submitted,

RUSSELL M. COLEMAN
United States Attorney

/s/ Amanda E. Gregory
Amanda E. Gregory
Jessica R.C. Malloy
Assistant U.S. Attorneys
717 West Broadway
Louisville, Kentucky 40202
PH: (502) 582-5016
FAX: (502) 582-5097

## **CERTIFICATE OF SERVICE**

  I hereby certify that on January 28, 2019, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to counsel for the defendant.

            s/ *Amanda E. Gregory*
            Amanda E. Gregory
            Assistant U.S. Attorney